**UNITED STATES of America,**
**Plaintiff,**

v.

**$2,000,000.00 IN U.S. CURRENCY,**
**Defendant.**

**Case No. 6:12–cv–1279–Orl–18KRS.**

United States District Court,
M.D. Florida,
Orlando Division.

Dec. 3, 2012.

Nicole M. Andrejko, U.S. Attorney's Office, Orlando, FL, for Plaintiff.

## ORDER

G. KENDALL SHARP, Senior District Judge.

THIS CAUSE comes for consideration on Claimant Prodira Casa de Cambio S.A. de C.V.'s ("Prodira") Motion to Dismiss the Amended Complaint (Doc. 20) to which the United States responded in opposition (Doc. 23). The Court has reviewed the motions and memoranda filed by Prodira and the United States, and Prodira's motion will be denied.

## I. BACKGROUND

The United States alleges that Prodira is a financial services company based in Guadalupe, Zacatecas, Mexico. (Doc. 17 at 5.) As part of its business, Prodira provides currency exchange services for its customers. (*Id.*) Alongside its legitimate business, Prodira has allegedly laundered money for Mexican drug trafficking operations ("DTO") since at least January 2010. (*Id.*) The flow of narcotics and funds between the DTOs and Prodira follows a typical pattern for laundering drug proceeds: (1) narcotics are smuggled into the United States from Mexico; (2) narcotics are sold for United States currency; (3) U.S. currency is smuggled from the United States to Mexico; (4) Prodira brings the U.S. currency back into the United States in its own name; (5) Prodira deposits the U.S. currency into bank accounts based in the United States belonging to a third party chosen by Prodira; and (6) the third party sends funds from its own account to various banks around the world. (*Id.* at 4–5.) In this case, Prodira followed the pattern described above, except the third party was an undercover business ("UCB") established by law enforcement agents and run by an undercover agent who posed as an associate of several Colombian DTOs. (*Id.* at 6.)

The undercover agent planned, with the self-proclaimed owner of Prodira, Filemon Garcia Alaya, to accept and deposit U.S. currency into the UCB's account after it was flown into the United States from Mexico and delivered to a bank by armored truck. (*Id.* at 5–6.) After charging a fee of approximately 0.3%, the undercov-

er agent would wire the funds to accounts designated by Alaya. (*Id.* at 6.) The United States alleges that there was no legitimate business reason for conducting these transactions in such a circuitous manner. (*Id.*)

Alaya and the undercover agent made nine separate deposits, totaling to $4,030,000.00, into the UCB's account between November 10, 2011 and December 9, 2011. (*Id.* at 7.) After each of these deposits, the undercover agent would initiate wire transfers (at various bank branches located within this judicial district) to Deutsche Bank, which would in turn credit Prodira's account with Banco Multiva, a Mexican bank. (*Id.*) Each time Prodira brought U.S. currency back into the United States, it was required to complete a Report of International Transportation of Currency or Monetary Instruments ("CMIR"). *See* 31 U.S.C. § 5316. Despite depositing money into the UCB's account several times, Prodira identified the UCB as the beneficiary of the funds on only one CMIR that it filed and it misidentified the amount on that form. (Doc. 17 at 7–8.)

On February 2, 2012, the undercover agent informed Alaya that he received a "promotion" and that a second person, also an undercover agent, would replace the first undercover agent as the person to work with Alaya. (*Id.* at 9.) During the same conversation, Alaya stated that he wanted the undercover agent to handle $2 million for him. (*Id.*) On January 5, 2012, Prodira imported $2 million in U.S. currency, the defendant funds in this case, to McAllen, Texas by way of a private aircraft. (*Id.*) On the CMIR, the pilot, Fran-

cisco Esparza Campos,[1] listed the UCB as the beneficiary of the currency and included a deposit slip for the UCB's bank account. (*Id.* at 9–10.) On February 8, 2012, the undercover agent informed Alaya that United States Customs and Border Protection ("CBP") contacted him regarding the status of the defendant funds that were then being held in at a Transvalue vault in Miami, Florida on behalf of Prodira. (*Id.* at 10.) On the same day, Esparza contacted CBP in an attempt to redirect the defendant funds away from the UCB to another beneficiary. (*Id.*)

Sometime between February 8, 2012 and March 5, 2012, the defendant funds were transported to a Rochester Armored Car facility in Pharr, Texas. (*Id.* at 11.) On March 5, 2012, United States Immigrations and Customs Enforcement seized the defendant funds, pursuant to a warrant, from the Rochester Armored Car facility. (*Id.*) A K–9 from the Pharr Police Department positively alerted to the currency, indicating that the currency had recently been in close proximity to a significant amount of a controlled substance. (*Id.*)

The United States brought its Amended Verified Complaint seeking in rem forfeiture of the defendant funds. Prodira now moves to dismiss the United States' Amended Verified Complaint for failure to state a claim upon which relief can be granted.

## II. ANALYSIS

The United States and Prodira dispute the proper application of the pleading standard for an in rem forfeiture proceeding brought pursuant to 21 U.S.C. § 881(a)(6).[2] Rule G(8)(b)(ii), which gov-

---

**1.** Esparza is also a Prodira employee. (*Id.* at 7.)

**2.** The instant proceedings were also brought pursuant to 18 U.S.C. § 981(a)(1)(A); however, the parties have not presented any argu-

ment as to the adequacy of the pleadings with respect to § 981(a)(1)(A). For the reasons discussed in this Order, the Amended Verified Complaint adequately states a forfeiture claim pursuant to § 981(a)(1)(A), which, generally,

erns motions to dismiss forfeiture actions, directs that "[t]he sufficiency of the complaint is governed by Rule G(2)." Rule G(2)(f) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions requires that a complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." At trial, the United States will have the initial burden of proving by a preponderance of the evidence that the property is subject to forfeiture. *See* 18 U.S.C. § 983(c)(1). However, "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D); Rule G(8)(b)(i). Rule G "is plainly written and 'means precisely what it says.'" *United States v. Mondragon*, 313 F.3d 862, 865 (4th Cir.2002)[3] (quoting *United States v. $38,000 Dollars in U.S. Currency*, 816 F.2d 1538, 1548 (11th Cir.1987)).

■ Here, the United States, through its Amended Verified Complaint, sets forth sufficient facts to support a reasonable belief that it will be able to meet its burden at trial. First, the United States alleges that Prodira transferred the defendant funds in a circuitous fashion that served no discernible legitimate business purpose; instead, the transactions followed the typical pattern of a Mexican DTO attempting to launder drug proceeds. *See United States v. $242,484.00*, 389 F.3d 1149, 1162 (11th Cir.2004) (the fact that a large quantity of currency was being transported according to a route and under circumstances well-known for transporting of drugs and returning drug pro-

ceeds weighed in favor of finding probable cause for seizure of defendant funds). Not only was the flow of funds circuitous, unusual, and seemingly unnecessary, Prodira paid a fee to the UCB to move the funds in this manner. Second, Prodira appears to have made a practice of transporting relatively large quantities of currency in this circuitous manner. *See id.* at 1160–61 (discussing how legitimate businesses would conduct a high-value transaction by wire transfer or cashier's check rather than physically transporting a large quantity of cash). Next, Prodira made many inaccurate statements on CMIRs nearly every time it brought currency into the United States. *See id.* at 1164–65 (improper documentation tended to support finding of probable cause for seizure of defendant currency).

Further, during a conversation with the undercover agent on November 15, 2011, Alaya made statements that suggest that he was involved with one or more criminal organizations. (*See* Doc. 17 at 9.) Alaya stated that an individual working with another company that accepted bulk cash owed Alaya money and needed to know "that there are other people that are behind him willing to kill or torture" to recover the money owed to Alaya. (*Id.*) Alaya also stated that he "had used these methods to make three people in Mexico disappear." (*Id.*) Additionally, Alaya stated that when people owe him money and it is "'his neck or theirs, it will always be theirs.'" (*Id.*) In a conversation with the undercover agent on February 21, 2012, Alaya mentioned that he was surreptitiously working with others and discussed the necessity of seeking approval for business decisions from his "seven silent partners."

---

provides for civil forfeiture of property involved in international money laundering.

**3.** The Advisory Committee Notes for the 2006 adoption of Rule G state that Rule G(2)(f)

carries forward the forfeiture case law from former Rule E(2)(a), namely *Mondragon*, without change.

(*Id.* at 10.) All of these statements suggest that Alaya was involved with one or more criminal organizations, and therefore, tend to support a reasonable belief that the government will meet its burden at trial. *See $242,484.00*, 389 F.3d at 1164 (discussing how participants in currency smuggling and money laundering operations involved with DTOs are often "kept in the dark" as to sources and ultimate recipients' identities so as to prevent an individual from providing those identities to law enforcement).

Moreover, although Prodira disputes the general trustworthiness of the positive K–9 alert to the defendant currency, the Eleventh Circuit has stated that a positive K–9 alert is relevant and "is yet another factor weighing in favor of probable cause." *Id.* at 1166. Although Prodira's motion to dismiss tests the adequacy of the complaint rather than the sufficiency of the evidence, the United States' allegation of the positive K–9 alert tends to support a reasonable belief that the United States will meet its burden at trial. *See United States v. $183,791.00 in U.S. Currency*, No. 1:06–CV–2791–JEC, 2009 WL 2957276, *6 (N.D.Ga. Sept. 15, 2009) (a positive alert by a narcotics detection dog to a large quantity of U.S. currency "is an important piece of evidence that unquestionably bolsters the Government's case for forfeiture.")

■ Finally, Prodira argues that the Amended Verified Complaint is deficient for its failure to identify a particular drug transaction or transactions from which the defendant funds were derived. However, when other circumstances are sufficiently indicative of drug trafficking activity, "it is not necessary to identify specific drug transactions in the complaint." *United States v. Two Parcels of Real Prop. Located in Russell Cnty., Ala.*, 92 F.3d 1123, 1127 (11th Cir.1996). Here, the United States has alleged facts that are sufficient-

ly indicative of drug trafficking activity and laundering of drug proceeds such that identification of a particular source transaction or transactions is unnecessary at the pleading stage.

### III. CONCLUSION

The United States' Amended Verified Complaint sets forth facts sufficient to support a reasonable belief that it will meet its burden at trial. Accordingly, Prodira's Motion to Dismiss the Amended Complaint (Doc. 20) is **DENIED**.

**DONE** and **ORDERED**.